Please call the next case. The next case is 5-12-0-5-4-2-W-C. Jamie Hitt, Ellen, V. Workers' Compensation Comm'n, Dwight, Emily, Cole, Kathleen. Mr. Jerome, you may proceed. Thank you, your honor. If I could reserve three minutes for rebuttal. You will. Thank you, your honor. May it please the court, Excellent. Good afternoon. My name is David Jerome. I represent Jamie Hitt in this matter. We're going to talk about one major issue or one main issue, two if I have time. First of all, we're going to be citing a lot to Justice Holdridge's decision that you were part of, the Gallianetti decision, because it's directly on point for what we're going to talk about today. The main question that we're talking about is whether the commission properly interpreted section 8d1 and 8d2 when they reduced a wage differential to a permanent partial disability. Since this involves a statutory interpretation, we believe that under the Puritan Finance case, this is a de novo review instead of a manifest weight case. As it's our belief that the commission didn't just add facts incorrectly. We think they added an addition to 8d1 that's not there. But Gallianetti, the Gallianetti case, specifically said isn't required. In the award, the commission states, and I'm going to quote this, the commission questions the validity of petitioner's search for alternate employment and finds that a wage differential was not proven in this claim. That's the only sentence that we have in the whole commission decision explaining why it went from a wage differential to a permanent partial. Now if you look at the statutory section 8d1, it says if as a result of a work injury, the employee becomes partially incapacitated from pursuing his usual and customary line of work, he shall receive compensation for the duration of disability that's two-thirds of what he was making versus what he is now making with the current level of disability. As the court said in Gallianetti, shall becomes an operative word there. It means you go 8d1 first and if you meet the criteria for 8d1, stop. Don't then move on to 8d2. So if we look at the two criteria, the first one is partial incapacity. Is he prevented from going back to doing what he was doing before? Second criteria is impairment of earnings. There's a note where this broke down. I understand your arguments and has intuitive appeal, but didn't the commission essentially find questions about the claimant's credibility and questions about Gonzalez's credibility? Didn't the case sort of turn on that? I would disagree because if you take a look at the beginning of the commission's decision, they say if we don't modify, if we don't reverse, everything else in this decision is deemed to be admitted, affirmed. If you take a look at where she questioned or where the commission questions Gonzalez, they questioned her relative to her bill. In fact, they even reversed her on the bill. As it relates to the labor market survey, there's no reversal. There's no modification. Obviously, they could have said, and that's what we were looking at too, saying, well, why didn't they say we find the labor market survey not credible? We find the claimant not credible with his job search relative to the dollar amounts that he's talking about. That's not what they said. They simply said, well, we think it was an invalid job search, so therefore we're finding the whole thing wage differential not proven, which to me begs the same question that I had the same question with this. If they're not saying that the labor market survey is invalid because they affirmed it, well, then really what you're dealing with is an uncontested labor market survey that's supported specifically by the petitioner's testimony. He went through 500 different job searches, and in those 500 different job searches, he's basically going through a very rural community where the city that he lives in is a whopping 486 people, I believe. He did 500 different contacts. He found three different jobs using family and friends. All of the jobs that he was looking at were paying between $8.50 to $10 per hour, exactly in line with what the labor market survey says. So to say it's an invalid search, well, that could invalidate his recommendation maybe for maintenance, but it doesn't invalidate the wage differential aspect of it. It simply supports what Gonzales said. And that labor market survey that we're talking about was what the commission affirmed when they said, we reverse as it relates to the bills, but we don't do anything as it relates to the arbitrator's conclusions that the labor market survey was valid. Well, if they didn't believe Gonzales in general, would that be a reason to undermine the labor market survey? If they didn't believe Gonzales in general, I would... That's simply what they're saying. We don't believe them. But that's not what they said. They questioned the validity of petitioner's search for alternate employment. They questioned the validity of Dolores Gonzales's bills, but they never questioned the validity of her conclusions. If they had said, we don't find her credible as it relates to her labor market survey, I would agree with you. There's nothing in the... So unless they actually specified that, they couldn't just disregard testimony completely. Right, because that's what they said at the beginning of their own decision. If I don't modify it, if I don't reverse it, it's deemed to be affirmed. And if you go back to the arbitrator's decision, he relied heavily on that labor market survey to say, here's my range, $8.50 to $10 per hour. I'm basing it upon a labor market survey. And given our experience with the labor market survey, that's not an unreasonable range given his rural location, given the fact that we're dealing with an individual with limited education, we're dealing with a young man who's essentially starting over. So if we begin with that premise that the labor market survey was correct, and we move on with the aspect of, was there an impairment here that removed him from his ability to go back to his coal, the coal mine? Well, the first element, they specifically said, yeah, we know that he cannot go back to the coal mine. That's the undisputed aspect. The ability or the labor market survey isn't even discussed. It's not deemed to be credible. It's not deemed to be an invalid search. So that's why we're saying, if you look at the Commission's decision, there's really no explanation for their invalidation of the wage differential except to say, well, Petitioner, you didn't do a valid job search. But if you take a look at the case, the Gallianetti case, Gallianetti specifically says, as it relates to 8b1, there is no requirement of a job search. There's none required whatsoever. And so when you're dealing with determining whether he fits under 8b1, for the Commission to come back and say, well, there had to be a valid job search associated with the Petitioner, that's where they erred. That's where Gallianetti has already said it's not an element. 8b1 only requires that you have incapacity, which in this case, with Jamie, he had, and I'll give you the one-minute dissertation of the facts, October 13, 2006, he had a crush injury to his right leg. Cable catches him, pins him up against a piece of equipment. As a result of it, he's told by his treating doctor, Dr. Houle, he's got permanent work restrictions. His functional capacity evaluation says permanent restrictions. Respondent's own medical examiner says permanent work restrictions. And the restrictions are such that after so many hours, he has to put that leg up. And in fact, the respondent's own doctor's restrictions are more severe than ours. So that's the undisputed aspect. We have the incapacity, the inability to go back to the coal mine. The Commission says Petitioner is unable to return to work in the coal mines per the functional capacity evaluation, per Dr. Houle's records, and per McFadden's deposition. So he's out of work. That job is paying him $900 per week. The next step is, do we have the impairment of earnings? And when you look to that, according to 8D1, you're going to look to things like labor market survey, petitioner's testimony. And you're not going to look at whether he had a valid job search, but whether that, the hourly rate is supporting what the labor market survey says. And in this situation, it supports it perfectly. She's saying an 8.5 to 10. His conclusions, whenever he did the job search, 8.5 to 10. If the Commission had said Gonzalez is not deemed to be credible, and that was their conclusion, I would be here under a manifest waive. They said nothing about her credibility, right? They said only as it relates to the bills. And so that's why, even whenever I'm looking at Respondent's brief, we were looking at that very situation because he cites to that, saying she was deemed not credible. Where in the Commission decision? I've read it many times. I see they're saying she's not credible regarding trying to substantiate her bills. But there was no discussion about the labor market survey deemed to be incredible anywhere in the Commission's decision. So you're saying that all claimants established is for impairment of earnings is the labor market survey? Yes. In his situation, because of the fact that the job searches that he was looking at were similar to what the labor market survey was showing. Now, taken to its nth degree, we could have held off and waited until he finally obtained reemployment, and then we would have had proof of it. But he was saying, I'm willing to accept the fact that I will find reemployment. And that becomes really important in this case, because if you take a look at what Ms. Gonzalez had said, she had said early on, he's permanently and totally disabled. What employer is going to hire an individual that if he's standing for two hours, he then has to sit down and elevate his foot for two hours? But this is a proud farmer. He said, I'm not going to be permanently and totally disabled. I will find employment somewhere, somehow. I'm willing to accept wage differential, instead of pushing for permanent total disability. So for me, I was thinking, this is the guy that needs to be rewarded, because of the fact that he's saying, I'm not going to sit on the couch and accept the permanent total disability. I'm going to find work somewhere, somehow. He found it. He had a couple of short-term seasonal jobs, and he showed that he was physically capable of at least doing them. The short-term seasonal jobs were with relatives, however, right? I'm sorry? Those were with relatives, those positions? Two of them, yes. The third one at the graveyard was not. He was mowing graveyards using a writing mower, and that was an actual job that he had obtained for, and that was, once again, seasonal. But yes, some of the other jobs were, he called on his uncle who had a farm, and he hit up families saying, will you hire me? And in fact, he was even looking at one point, as you see in Ms. Gonzalez's deposition, he was even talking about, if no one else will hire me, can I start my own business with my father? He's doing everything in his power to try to find re-employment. And so that's why, whenever I'm reading this saying, his labor markets, or whenever he's doing his job search, it's invalid. I'm thinking, 500 jobs in this rural setting, that's a feat in and of itself to try and find that many potential employers with where he lives. So, that's why. What was Ms. Gonzalez's description? Was she really a, what? She was a vocational rehabilitation specialist, and she was brought in to help him to find re-employment in the open labor market. But as part of the, whenever she was going through the months of assisting him- Isn't the real factor, he's how old, 29? I believe he's a little older than that now. What person in the right mind would say, you need to get an education? What? Yeah, I'm amazed, these counselors. I mean, of course, I don't think the commission found her very credible on anything, because wouldn't even a non-counselor observing this fact pattern suggest that, rather than making an effort to get some education that makes you more employable in the labor market? I mean- Of which case, that is certainly an option that we would entertain and then some. There was discussions early on with this process where she was discussing with him further schooling. But at the point where we were at with all of this, because of the denial that had been going on, he was throwing his hands up saying, I'm going to find a job somewhere in my current state. I'll find a job somewhere. I'm willing to accept wage differential based upon what the labor market survey had said. And so that's where the arbitrator was saying, there is a labor market survey that's consistent with the jobs that he was actually in.  He had just gone to some interviews in hopes of finding re-employment within his current physical status using the nationality guidelines. So that always becomes problematic of getting to more schooling when the vocational specialist is saying, he's getting hits. He's got people that are looking at him that are wanting to interview him. So it's tough to get to the schooling aspect whenever he is at least looking or being looked at by employers in his current state. So that's why we were looking at this on the issue of a wage differential. And so what we're asking is that it be reversed relative to this issue of the finding of wage differential in the arbitrator's decision. He reinstated it because I think he got it right. I think he was seeing, here's an individual that he's met that he found incredible. And he said, when I met with him, I think that he was doing a valid job search to the point that he awarded the wage differential. He found Ms. Gonzalez and her labor market survey to be valid. And that's why he had awarded what he awarded. So that's why when we're seeing the reversal from the commission without really an explanation, except to say petitioners search for alternate employment, no discussion of the labor market survey, only talking about his job search, which we know under Gallianetti, it's not even a requirement under 8D1. So if it's not a requirement, then he's already met his two criteria. And you don't go on to 8D2. You remain at 8D1 with the idea being that that's the wage differential. He's proven the two elements of it. So I see my time's about up. So I was going to go on to the penalty issue. I'll reserve that for my brief. Any questions? I believe so. Thank you, counsel. Mr. Haslund? Thank you. Good afternoon, Mr. Giron. I want to address a couple of points real quick that he mentioned at the very end. Functional capacity evaluation. Way after the fact. This is four or five years down the road. And the commission explicitly states in his decision, we want to find out one thing. Can he stand on his legs for more than two hours? Why wasn't that one thing addressed in the functional capacity evaluation? Petitioner did have a functional capacity evaluation, 10-13-10, but petitioner was not tested to see how long he could stand before his legs began to swell. That's all we want to know. Is this a credible, self-serving statement by the petitioner? I can't stand on my legs. Nobody saw it. There's no evidence here other than him saying it. He told Dr. Boulay, I've got photographs. When I stand on my feet, so does one. Dr., did you ever see the photograph? No, he never brought them in. This is a credibility question. The commission has a serious, serious credibility issue with Dolores Gonzalez. I agree 100% with what you just said. Well, what about that? Now, his response to that, we asked him about that, is, hey, they had a problem with her billing statements, but they didn't seem to have any problem with her survey. They pick and choose. Over the years, I've seen it where, and we've seen in awfully worded decisions from the commission, such as this morning, but they pick and choose what they do. And sometimes they try to do it very politely. And they want to come up with ways to show or to say, we have a credibility problem with Dolores Gonzalez. They simply addressed it in the part of her bill, which is a significant part. How do you throw out an entire bill for the vocational rehabilitation specialist,  but yes, her testimony and her opinions are credible? Well, if an attorney files some billing statements, and the court finds the billing may be excessive, does that mean the lawyer is incompetent? I'm sorry. I didn't follow that. If you file a fee petition, and the court doesn't agree and grant you with your fees, what you're asking for, does that mean the lawyer is incompetent? No. I mean, the truth is to be saying, hey, they didn't like her bills. I thought they were excessive. Does that mean that her work is faulty? No. That wasn't their point. Their point with the bill is, there wasn't sufficient testimony or credible testimony in the large paragraph that they talk about her bills that support the bills. And they're saying that we have a credibility issue with that. Would it have been easier for all of us if the commission would have just said, we do not believe Dolores Gonzalez? Yes, it would have been easier. We don't see that very often in commission decisions. We don't see where we find petitioner to be a liar. We find petitioner to be not credible. We don't see that very often. What we do see is sort of the opposite. We find petitioner to be a credible witness. They almost never say the opposite. But his argument, even though they acknowledge they clearly had a problem with the bills, they implicitly approved the service that they said was going to help. I don't think you can make that jump. I don't think you can say just because they didn't find her not credible means she's credible. I don't see the leap there. But on the first page of their decision, they have a problem with Dr. McFadden and the testament about standing on his legs. Then they go to the functional capacity evaluation. But this really is. And then what Mr. Jerome was talking about, the one sentence, the commission questions the validity of petitioner's search for alternate employment and fines as a wage differential was not proven in this claim. This is sort of two different things. They look at the first page of our decision and throw in the fact that they question the validity of his job searches. So that is the basis for them denying the claim. They didn't say, because we question the validity of the job searches, we are refusing to order 8D1 wage differential. They don't say that. I didn't read it as that way. I think if the commission has a significant problem with the credibility of the vocational specialist and the petitioner, then that's where we get into the manifest way. And that's where this court has to affirm. The problem with Dolores Gonzalez, and I suppose you saw it, it took two different visits over there to depose her, four or five hours of time. I mean, it was like pulling teeth. I mean, trying to get her to answer some questions. Her involvement in this case was not by Mr. Jerome. It was by prior counsel. For one reason, evaluate him, write a report, close your file. How is that vocational rehabilitation? That was her instructions by the first attorney. Get in, interview him, write me a report, close your file. I asked her that several times. And it's not disputed. What about he opines that there was a diligent job search? Obviously, I'm assuming you don't agree with his argument claiming all you have to do. I apologize for saying it that way. When I saw the job search records, I mean, I was just astounded. I mean, I've seen cases that this court has ruled on where there have been true 400, 500 job searches in a lot of time and a lot of involvement over the years and documented personal searches, not just on the internet or not just by telephone. And this court still finds that it was not valid. It's not the quantity, this court says. It's the quality of the job searches. And there's no way on God's green earth this man did 500 job searches of quality job searches where he lived in the time frame and tried to support it with the exhibit they offered at trial. Was there contemporaneous documentation of all these job searches that he purported? If the key word there is contemporaneous, no. These were, this was a document prepared for the purpose of litigation. This is not something that was sent to me on a regular basis when it happened. Mr. Head was very content to sit on the couch. He received one year of work with TTD benefits. When he reached maximum medical improvement, he had a significant benefit with the company to receive two years of LTD benefits at the same amount of money. He sat around for three years without doing anything. He claims, well, my job search is fine. I look at the dates. Show me the dates where you claim you're doing job searches while you're collecting these benefits. They're not there. He said, I started October 2007 when the doctor released me. Not there. It's not there. That exhibit of job search record is a terrific exhibit for the respondent because it disproves what he is saying. If their contention is that they're entitled to wage differential benefits because Ms. Gonzalez four or five years later did a labor market survey, she never left the state of Missouri to help this gentleman. And her assistant that we were charged for, they never came over here to help him. He lives two and a half, three hours away. They sat in Missouri. Where is the effort? Where's the labor market survey? It's all done by internet now. Is that how we do things? This gentleman has a very poor work record which is contained in her very first report. And I asked her about that. He rarely, rarely works anywhere more than two or three or four months. That's no big deal to me. That's no hill for a climber for Ms. Gonzalez. Of course it is. Employers look at that stuff. Why isn't that important? He didn't have any response to that. This is a question of fact case. There's nothing here that is a question of law. The same argument was presented in the circuit court and the judge agreed it's a question of fact. And we would ask that you affirm the commission's unanimous decision. Where did the petitioner live? What town? East of Benton. He moved a bunch or twice, but I think all in that area. He was east of Benton and probably an hour west of Carmine. Thank you, counsel. Counsel, you may reply. Thank you, your honor. The answer to that last question is Thompsonville. Population 486. Rural communities surrounding it. If you made a circle 50 miles around it, you're going to see farmland and farmland and more farmland. Now let's go backwards. Mr. Haslett, as you can see, even in his brief and during the trial, he makes these accusations. Oh, that's a horrible job search. Oh, he wasn't trying. He wants to sit on the couch. We provided him with job search of 500 plus contacts. Did he date them? No, he didn't. Was it through the years? Yes, it was. He talked about four years ago when a vocational assessment was made on this case. He's right. It was with the previous attorney. That vocational assessment was sent to Mr. Haslett with a demand. Will you provide vocational services? Never responded. So now here we are four years later and they're going to attack Jamie saying, you didn't do the job search right. Well, by golly, if they'd have authorized vocational services from the get-go, we wouldn't even be here today. They would have had him in a job, hopefully, because he wouldn't have had that big break in time where he was having to struggle on his own to try and find these connections. He would have had the assistance he needed. They would have had the job searches that they needed. We would have been able to move forward with this case in the proper direction. But they sat on their hands. They said, we're not paying him maintenance. He's getting paid disability, so we don't have to worry about it. And so here we are four years later. They're going to tear apart each one of them. And by the way, at the time of trial, he's never once said any one of the contacts were invalid, inappropriate, inconsistent, or outright lies. There's no evidence of that. Normally, in situations like this, if they think that the petitioner is not doing a valid job search, they would bring in their own vocational expert who's going to say, that's an invalid job search because you really didn't contact that person. No such evidence. So that's where I'm saying, where's the invalidity coming from? He's done what he was supposed to do on his own, doing the best he could in the rural setting he was at. And oh, by the way, at two years time after that time period, his money ran out. He's been struggling with part-time jobs, struggling with mowing cemeteries, doing whatever he can to make ends meet, living off his girlfriend's money at this point. And so he's struggling. But all the while, he's saying the same thing. I'm not going to quit. I'm not permanently and totally disabled. I'm going to find a job. That's where Dolores said, all right, you're not perm-total because you don't want to be. I'm not going to make a man perm-total because he says he doesn't want to be. She testified to that. Instead, we're going to take a look at, if you find employment, what's reasonable? What's the reasonable rate? That's what the labor market was. That's what we're talking about. That's what the commission did not find invalid. So to say then, as part of their conclusions, that he had to, that there was an invalid or that they questioned his search for alternate employment, that doesn't matter to me. We're talking about the wage differential portion of 8D1. Now, Mr. Haslett also said too, well, they didn't really say that Dolores had done anything that her credibility was in question because they don't do that. They want to be polite. I've been doing this 20 years. I've never seen an arbitrator or even a commission who's been concerned about saying this expert is not credible. They do it every day, especially in this situation where it's uncontested. The only expert in this case who gave information about a labor market survey was Dolores. They didn't bring in another one saying, no, he can go back making 30 bucks an hour. The only job search from this came from Dolores Gonzalez. There was no evidence saying, attacking that her labor market survey was invalid. Yeah, we spent five hours, four of which we went through the bills. You'll see in the transcript. He tested or had her go through each entry and that's what took so long. But as far as her labor market survey, there was no real question surrounding the accuracy of it or the validity of it. Commission didn't see it. Commission didn't attack her. They attacked Petitioner. They said Petitioner...